# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS
### (Wichita Docket)

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                   CASE NO.: 6:24-cr-10135-EFM

HUNTER C. BEIER,

        Defendant.

---

## GOVERNMENT'S RESPONSE TO THE DEFENDANT'S MOTION TO DISMISS COUNTS 1 AND 2 OF THE INDICTMENT
(Doc. 20)

---

APPEARS NOW the United States of America, by and through Lanny D. Welch, Assistant United States Attorney, and respectfully submits the following in response to the defendant's motion to dismiss Counts 1 and 2 of the Indictment. (Doc. 20)

## I.    **THE DEFENDANT'S MOTION**

The defendant moves this Court to dismiss Counts 1 and 2 of the Indictment, charging violations of 18 U.S.C. § 922(o)— possession of a machinegun. (Doc. 20

at 1-8.)[1]  The defendant maintains that Section 922(o) "offends the history and tradition of the Second Amendment . . . by imposing a blanket prohibition on machine guns that is both facially unconstitutional and unconstitutional as applied to [him]." *Id*. at 1.

## II.     <u>FACTS</u>

On October 4, 2022, federal agents executed a search warrant at a residence located at 25009 K-15 Hwy, Dexter, Kansas 66751. This was known to be the residence of Hunter C. Beier, the defendant. During the execution of the warrant agents located a Goryunov type, Model SG43, 7.62x54R caliber machinegun[2] and a Griffin Armament, Model MK1, 5.56mm NATO caliber machinegun. Both firearms were submitted to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Firearms & Ammunition Technology Division for analysis. Following an examination of both weapons, ATF firearms examiners determined both guns were machineguns because they were capable of shooting automatically more than one shot, without manual reloading, with the single function of a trigger. A review of

---

[1] The National Firearms Act of 1934 ("NFA") defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger" as well as "the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845(b).  That definition has been incorporated into Title 18 by reference. *See* 18 U.S.C. § 921(a)(24) ("The term 'machinegun' has the meaning given such term in section 5845(b) of the National Firearms Act (26 U.S.C. 5845(b)).").

[2] The SG-43 Goryunov was a Soviet medium machinegun produced for the Soviet army during World War II.

ATF licensing records indicated the defendant had not registered either machinegun, so his possession of these weapons was unlawful pursuant to Title 18, U.S.C. § 922(o). The indictment, charging separate violations of Title 18, U.S.C. § 922(o), was returned on January 26, 2024. (Doc. 1)

### III.  **ARGUMENT**

#### A. Legal Standard

The Second Amendment to the Constitution provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  However, "[l]ike most rights, the right secured by the Second Amendment is not unlimited; it does not allow every person "to keep and carry any weapons whatsoever in any manner whatsoever and for whatever purpose."  *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  In evaluating what limitations Congress can impose on citizens' Second Amendment rights, the Supreme Court has directed courts to ask two questions: (1) whether "the Second Amendment's plain text covers an individual's conduct," *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111, 2129–30 (2022), and (2) if not, whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

### B. Statutory background

Subject to two narrow exceptions, § 922(o) makes it "unlawful for any person to transfer or possess a machinegun." 18 U.S.C. § 922 (o)(1). The first exception is for machineguns transferred or possessed by government entities. § 922(o)(2)(A). The second is for machineguns that were lawfully possessed before the statute's effective date in 1986. 18 U.S.C. § 922 (o)(2)(B). Section 922(o)'s enactment as part of the Firearm Owners' Protection Act in 1986 thus "capped" civilian ownership "at pre[-]1986 levels." *Bevis v. City of Naperville*, 85 F.4th 1175, 1202 (7th Cir. 2023).

A "machinegun" is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845 (b); *see* 18 U.S.C. § 921(a)(24) (incorporating definition from Title 26). The term also includes "any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b)(b).

### C. The Second Amendment does not protect firearms that are not typically possessed by law-abiding citizens for lawful purposes.

The Second Amendment states that the "right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Amendment "protect[s] an individual right to keep and bear arms for self-defense." *New York State Rifle*

4

& *Pistol Ass'n, Inc. v. Bruen*, 597 U.S 1, 17 (2022).  The right, however "was never thought to sweep indiscriminately." *United States v. Rahimi*, 602 U.S 680, 691 (2024).  "Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

When considering whether a firearm regulation is constitutional, the appropriate test is based on "the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19.  If the "plain text" of the Amendment "covers an individual's conduct," the regulation must be "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.  But "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 602 U.S. at 691-92.  Instead, the modern law "must comport with the principles underlying the Second Amendment." *Id.* at 692.

The Supreme Court has recognized an "important limitation on the right to keep and carry arms"—"the sorts of weapons protected [a]re those 'in common use at the time.'" *Heller*, 554 U.S. at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).  Put another way, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625.  Courts cannot look at the Amendment's text in isolation but

must instead consider the text "according to the understandings of those who ratified it," *Bruen*, 597 U.S. at 28.  And, as *Heller* explained, the right to bear arms was not understood in 1791 as "a right to keep and carry any weapon whatsoever," *Heller*, 554 U.S. at 626, but only as a right to possess firearms "'in common use at the time,'" *id.* at 627.

Heller went on to hold that the textual "common use" limitation also "accords with the historical understanding of the scope of the right." *Heller*, 554 U.S. at 625.  The Court explained that this "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627.  Thus, whether as a matter of text, history, or both, firearms that are not "in common use" for "lawful purposes" are unprotected.

The Supreme Court first applied the "common use" limitation in *Miller*, which upheld convictions for possession of unregistered short-barreled shotguns in violation of the National Firearms Act.  *Miller*, 307 U.S. at 179.  *Miller* said it could not conclude that "the Second Amendment guarantees the right to keep and bear such an instrument [a short-barreled shotgun]," which was not "part of the ordinary military equipment." *Id.* at 178.  Subsequently, *Heller* explained that *Miller*'s reference to "ordinary military equipment," "[r]ead in isolation," might be taken to mean that "only those weapons useful in warfare are protected." *Heller*, 554 U.S. at 624.  But *Heller* rejected that "startling reading" of *Miller*, which

"would mean that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional." *Id.* Instead, *Heller* read *Miller* as holding that the Second Amendment protects the kinds of weapons used for militia service at the founding, that is, "arms 'in common use at the time' for lawful purposes like self-defense." *Id.* (quoting *Miller*, 307 U.S. at 179).

*Bruen* did not call into question *Miller* and *Heller*'s "common use" limitation. *Bruen* explained that *Heller* had "relied on the historical understanding of the Amendment to demark the limits on the exercise of that right." *Bruen*, 597 U.S. at 21. "For example," *Heller* had "found it 'fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons"'" that the Second Amendment applies to weapons that are "in common use at the time." *Id.* (quoting *Heller*, 554 U.S. at 627). Later, *Bruen* again mentioned that, "[d]rawing from this historical tradition," *Heller* had "explained . . . that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'"**Error! Bookmark not defined.** *Id.* at 47 (quoting *Heller*, 554 U.S. at 627). *Rahimi* too recognized that some jurisdictions at the founding "banned the carrying of 'dangerous and unusual weapons.'" *Rahimi*, 602 U.S. at 691. Accordingly, the Supreme Court has established that, consistent with the principles underlying the Second Amendment, the government may regulate firearms not typically possessed

by law-abiding citizens for lawful purposes, such as dangerous and unusual

weapons.

### D. Machineguns are not in common use for lawful purposes.

Machineguns are not protected by the Second Amendment because they are

not "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554

U.S. at 625, 627, but are instead "adapted for unlawful uses," *Rocky Mountain Gun*

*Owners v. Polis*, 121 F.4th 96, 116-17 (10th Cir. 2024).

Since *Heller*, multiple courts of appeals have upheld § 922(o) on the basis

that "[m]achine guns are not in common use by law-abiding citizens for lawful

purposes."  United States v. Fincher, 538 F.3d 868, 874 (8th Cir. 2008; *see United*

*States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822

F.3d 136, 142 (3rd Cir. 2016) (machineguns are "not in common use for lawful

purposes"); *Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) ("Machineguns are

dangerous and unusual and therefore not in common use."); *United States v.*

*Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (observing that "[a] machine gun is

'unusual'" and that "[o]utside of a few government-related uses, machine guns

largely exist on the black market"); *Hamblen v. United States*, 591 F.3d 471, 474

(6th Cir. 2009) (challenge to § 922(o) was "foreclosed" by *Heller*'s statement that

"'the Second Amendment does not protect those weapons not typically possessed

by law-abiding citizens for lawful purposes'"); *United States v. Zaleski*, 489 F. App'x 474, 475 (2d Cir. 2012) (unpublished) (same).

The reasoning of those courts is supported by the relevant evidence. Machineguns are extraordinarily lethal. The Supreme Court has recognized "[t]he immense danger posed by machineguns." *United States v. O'Brien*, 560 U.S. 218, 230 (2010). As the Ninth Circuit has explained, "[a] modern machine gun can fire more than 1,000 rounds per minute, allowing a shooter to kill dozens of people within a matter of seconds." *Henry*, 688 F.3d at 640. Thus, "[s]hort of bombs, missiles, and biochemical agents," that court could "conceive of few weapons that are more dangerous than machine guns." *Id.*

Moreover, machineguns are "specially adapted to unlawful uses." *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari) (Thomas, J., dissenting from denial of certiorari); *see Polis*, 121 F.4th at 116-17 (observing that "the Second Amendment does not extend to weapons" that are "adapted for unlawful uses"). As Congress has observed, machineguns are "used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954), and are "used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime," H.R. Rep. No. 99-495, at 4 (1986).

The legislative landscape reflects this judgment and indicates that machineguns are not in common use for lawful purposes. Twelve states and the District of Columbia prohibit the possession of machineguns by private persons, regardless of whether they are properly registered under the National Firearms Act.[3] Another 25 states regulate or ban private machinegun possession while providing an exception or affirmative defense for machineguns possessed in compliance with federal law.[4] And two states, without mentioning federal law, require registration of machineguns and make their public carry presumptively unlawful.[5] Thus, unlike with commonly owned firearms such as handguns, there is a nationwide legislative consensus of prohibiting or severely restricting the possession of machineguns.

Statistical evidence also shows that machineguns are not typically possessed by law-abiding citizens for lawful purposes. As of 2016, there were "175,977 pre-

---

3 Cal. Penal Code § 32625; Colo. Rev. Stat. § 18-12-102; Del. Code Ann. tit. 11, § 1444 (a)(5); D.C. Code Ann. § 22-4514; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1 (a)(7)(i); Iowa Code §§ 724.1, 724.3; Mass. Gen. Laws ch. 140, § 131 (o); Minn. Stat. § 609.67, subd. 2; N.J. Stat. Ann. § 2C:39-5 (a); N.Y. Penal Law § 265.02 (2); R.I. Gen. Laws § 11-47-8 (a); Wis. Stat. § 941.26 (1g)(a).

4 Alaska Stat. § 11.61.200 (a)(3), (c), (h)(1)(C); Ariz. Rev. Stat. Ann. §§ 13-3101 (A)(8)(a)(iii), 13-3102 (A)(3), (F); Ark. Code Ann. §§ 5-73-204, 5-73-205; Conn. Gen. Stat. § 53-202 (g), (h); Fla. Stat. § 790.221; Ga. Code Ann. §§ 16-11-122, 16-11-124; Ind. Code §§ 35-47-5-8, 35-47-5-10; Kan. Stat. Ann. § 21-6301 (a)(5), (h); La. Stat. Ann. § 40:1752; Me. Stat. tit. 17-A, §§ 1051, 1052; Mich. Comp. Laws § 750.224 (1), (3)(c); Mo. Rev. Stat. § 571.020; Neb. Rev. Stat. § 28-1203; Nev. Rev. Stat. § 202.350 (1)(b); N.C. Gen. Stat. § 14-409; N.D. Cent. Code § 62.1-05-01; Ohio Rev. Code Ann. §§ 2923.11 (K)(1), 2923.17 (A), (C)(5); Or. Rev. Stat. § 166.272; 18 Pa. Cons. Stat. § 908; S.C. Code Ann. §§ 16-23-230, 16-23-250, 23-31-330; S.D. Codified Laws §§ 22-1-2 (8), (23), 22-14-6; Tenn. Code Ann. § 39-17-1302 (a)(3), (d); Tex. Penal Code Ann. § 46.05 (a)(1)(B); Wash. Rev. Code § 9.41.190 (1), (4); W. Va. Code § 61-7-9.

5 Md. Code Ann., Criminal Law §§ 4-403, 4-404, 4-405; Va. Code Ann. §§ 18.2-290, 18.2-291, 18.2-295.

1986 civilian-owned machineguns in existence." *Hollis*, 827 F.3d at 449 (citing ATF statistics); *see* Record on Appeal at 167, *DeWilde v. Attorney General*, No. 23-8054 (10th Cir.) (2016 ATF letter).  That is a tiny fraction of the 300 million to 500 million privately owned firearms in the United States.[6]  And it pales in comparison even to the number of firearms manufactured in and imported into the United States every year, which has exceeded 20 million in recent years.[7] Moreover, those approximately 176,000 civilian-owned machineguns are not spread over 176,000 civilians, because many are amassed by collectors who own multiple machineguns.[8]  But even assuming (wrongly) that those machineguns were spread among 176,000 civilians, only one in 1,908 Americans—roughly 0.05% of the population—would legally own a machinegun,[9] compared to the roughly one in three Americans who owns a firearm.[10]

---

6 *See* The Trace, *How Many Guns are Circulating in the U.S.?*, https://www.thetrace.org/2023/03/guns-america-data-atf-total/ (estimate of 494 million); Small Arms Survey, Estimating Global Civilian-Held Firearms Numbers, at 4 (June 2018), https://www.smallarmssurvey.org/sites/default/files/resources/SAS-BP-Civilian-Firearms-Numbers.pdf (estimate of 393 million); John Berrigan, et al., *The Number and Type of Private Firearms in the United States*, Annals of the American Academy of Political and Social Science, Vol. 704, Issue 1, at 82 (Nov. 2022) (estimate of 326 million in 2019).

7 *See* The Trace, *How Many Guns are Circulating in the U.S.?*, https://www.thetrace.org/2023/03/guns-america-data-atf-total/.

8 *See* Boise State Public Radio, *Automatic weapons are legal, but it takes a lot to get one of the 630,000 in the U.S.* (Dec. 21, 2018), https://www.boisestatepublicradio.org/news/2018-12-21/automatic-weapons-are-legal-but-it-takes-a-lot-to-get-one-of-the-630-000-in-the-u-s (interviewing a collector with more than 20 machineguns).

9 *See* U.S. Census Bureau, Happy New Year 2024!, https://www.census.gov/library/stories/2023/12/happy-new-year-2024.html (estimating a population of 335,893,238).

10 *See* Pew Research Center, Key facts about Americans and guns, https://www.pewresearch.org/short-reads/2024/07/24/key-facts-about-americans-and-guns/.

Given the fixed supply of pre-1986 machineguns, the cost of a privately registered machinegun is extremely high. "[T]oday, a transferable M16 costs nearly $30,000 while 'entry-level' machine guns cost in the ballpark of $10,000." Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dickinson L. Rev. 273, 285 (2022). The current wait time for such a transfer (accomplished using ATF Form 4) is 137 days for paper forms and 28 days for electronic forms. *Id.* at 289 & n.81; ATF, Current Processing Times, https://www.atf.gov/resource-center/current-processing-times (as of Dec. 1, 2024). The limited number of pre-1986 machineguns in civilian hands, their high cost, and the difficulty of acquiring them all indicate that they are not "in common use" or "typically possessed by law-abiding citizens." *Heller*, 554 U.S. at 624-25, 627.

Accordingly, the other circuits to consider the question have all agreed that machineguns not typically possessed by law-abiding citizens for lawful purposes and are instead "dangerous and unusual." *See Fincher*, 538 F.3d at 874; *Hollis*, 827 F.3d at 451; *One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*, 822 F.3d at 142-44; *Henry*, 688 F.3d at 640. Indeed, *Heller* itself observed that it would be "startling" to conclude that "restrictions on machineguns . . . might be unconstitutional." *Heller*, 554 U.S. at 624. This Court should follow *Heller* and other circuits in holding that machineguns are not "typically possessed

by law-abiding citizens for lawful purposes," but are instead "dangerous and unusual." *Id.* at 625, 627 (quotation omitted).

### E. Section 922(o) is consistent with the historical principle that the government may ban dangerous and unusual weapons.

Because it prohibits possession only of firearms that are not typically possessed by law-abiding citizens for lawful purposes, § 922(o) is "consistent with the principles that underpin [the Nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692. As *Heller* explained, the "common use" limitation "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627 (citing 12 historical sources). Thus, *Heller* has already authoritatively established this principle, *see Rahimi*, 602 U.S. at 692, and this Court need not sift through any additional historical sources to double-check the Supreme Court's work.[11]

In any event, an array of historical laws confirms the principle that *Heller* recognized. In England, the 1328 Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 597 U.S. at 41-45. This statute was understood to provide that "[t]he offence of riding or going armed, with dangerous

---

11 This is not to say that the historical evidence does not support other constitutional principles justifying firearm regulation. *See Rahimi*, 602 U.S. at 702 (declining, like prior cases, to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" (quoting *Bruen*, 597 U.S. at 31)). For present purposes, however, the principle that governments may ban firearms that are not in common use for lawful purposes is sufficient to dispose of this case.

or unusual weapons, is a crime against the public peace, by terrifying the good people of the land." 4 William Blackstone, *Commentaries on the Laws of England* 148-49 (10th ed. 1787); *see Rahimi*, 602 U.S. at 697-98. In this way, the statute was consistent with the common law offense of "affray," which included cases "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." 1 Richard Burn, *The Justice of the Peace, and Parish Officer* 13-14 (2d ed. 1756); 1 William Hawkins, *A Treatise of the Pleas of the Crown* 135 (1716).

The American colonies likewise "prohibited the carrying of 'dangerous and unusual weapons.'" *Bruen*, 597 U.S. at 47; *see Heller*, 554 U.S. at 627. Early American justice-of-the-peace manuals empowered justices to confiscate the arms of a person who "arm[ed] himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[12] Colonial Massachusetts (1692) and New Hampshire (1701) codified this authority, providing that justices of the peace could arrest "all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride, or go armed offensively . . . by night or by day, in fear or

---

12 Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer*, 12-13 (1773) (Mass.); William Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.); James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.).

affray of their majesties' liege people."[13]  In the late-18th century, the
Commonwealth of Virginia (1786) similarly provided that no person shall "ride
armed by night nor by day, . . . in terror of the Country,"[14] and the Commonwealth
of Massachusetts (1795) later again directed justices of the peace to arrest "all
affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go
armed offensively, to the fear or terror of the good citizens of this
Commonwealth."[15]  Confirming that these early laws targeted not just "terror" but
also dangerousness, the province of East New Jersey (1686) prohibited the
*concealed* carry of "unusual and unlawful weapons."[16]  Although these statutes
contemplated that an affray required "something more" than merely carrying any
firearm in public, *Bruen*, 597 U.S. at 50, they contemplated that it would naturally
constitute affray to carry dangerous and unusual weapons, *see id.* at 46-47.

Throughout the 1800s, states adopted restrictions on a wide variety of
dangerous and unusual weapons.  For example, many states banned the sale, carry,
or concealed carry of dangerous knives such as Bowie knives, Arkansas

---

13 *See* Act of Nov. 1, 1692, ch. 18, § 6, *in* 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869);
Act of June 14, 1701, ch. 7, *in* 1 *Laws of New Hampshire 679* (Albert Stillman Batchellor ed., 1904).

14 Act of Nov. 27, 1786, ch. 21, *in A Collection of all such Acts of the General Assembly of Virginia, of a Public
and Permanent Nature, as are now in Force* 33 (1794).

15 Act of Jan. 29, 1795, ch. 2, 1795 Mass. Acts 436.

16 An Act Against Wearing Swords, &c., ch. 9, *in* Aaron Leaming & Jacob Spicer, *Grants, Concessions, and
Original Constitutions of the Province of New Jersey* 289-90 (2d ed. 1881).

toothpicks, dirks, and daggers.[17]  Many states also banned the possession, sale,

carry, or concealed carry of blunt weapons such as slung shots, brass knuckles,

and billy clubs.[18]  Consistent with a colonial New Jersey (1771) statute that made it

a crime to "set any loaded Gun . . . intended to go off or discharge itself, or be

discharged by any String, Rope, or other Contrivance,"[19] various states in the 19th

and 20th centuries criminalized the setting of "trap guns."[20]

---

17 *See, e.g.*, Act of Dec. 25, 1837, § 1, 1837 Ga. Laws 90; Act of Jan. 27, 1838, ch. 137, § 1, 1838 Tenn. Pub. Acts 200; Act of Feb. 2, 1838, ch. 101, § 1, 1838 Va. Acts 76; Act of Jan. 6, 1841, Penal Code, ch. 7, § 4, 1840 Ala. Laws 148-49; Act of Mar. 14, 1855, No. 120, § 115, 1855 La. Acts 148; Act of Feb. 23, 1859, ch. 78, § 1, 1859 Ind. Laws 129; Act of Mar. 18, 1859, § 1, 1859 Ohio Laws 56-57; Act of Mar. 1, 1864, ch. 128, § 1, 1864 Cal. Stat. 115; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25; Act of Feb. 15, 1872, ch. 7, § 1, 1872 Wis. Laws 17; Act of Mar. 4, 1873, ch. 58, pt. 1, ch. 4, § 25, 1873 Neb. Laws 724; Act of Dec. 27, 1873, ch. 226, § 168, 1872 W. Va. Acts 709; Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57; Act of Feb. 28, 1878, ch. 46, § 1, 1878 Miss. Laws 175; Act of Mar. 5, 1879, ch. 1 § 1, 1879 N.C. Laws 231; Act of May 24, 1879, § 1, 1879 Ill. Laws 114-15; Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447-48; Act of Feb. 1, 1881, § 1, 1881 Colo. Laws 74; Act of Apr. 1, 1881, ch. 96, § 1, 1881 Ark. Acts 191-92; Act of April 16, 1881, § 4, 1881 Ill. Laws 74; Act of Mar. 14, 1882, ch. 219, § 1, 1881 Va. Acts 233; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of Feb. 18, 1885, § 1, 1885 Or. Laws 33; Act of Apr. 7, 1886, ch. 375, § 1, 1886 Md. Laws 602; Act of May 31, 1887, No. 129, § 1, 1887 Mich. Pub. Acts 144; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231-32; Act of June 2, 1893, ch. 4124, § 1, 1893 Fla. Laws 51.

18 *See, e.g.*, Act of Apr. 7, 1849, ch. 278, § 2, 1849 N.Y. Laws 404; Act of Nov. 12, 1849, No. 36, § 2, 1849 Vt. Acts 26; Act of Aug. 6, 1868, No. 13, ch. 1637, ch. 7, § 11, 1868 Fla. Laws 95; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws 25; Act of Feb. 16, 1875, § 1, 1875 Ark. Acts 156-57; Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 73; Act of Mar. 24, 1882, ch. 135, § 1, 1882 W. Va. Acts 421; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Pub. Laws 231-32.

19 Act of December 21, 1771, ch. 540, § 10, 1771 N.J. Laws 346.

20 *See, e.g.*, Act of Mar. 6, 1852, § 103, 1851 Utah Laws 137; Act of Feb. 25, 1869, ch. 33, § 1, 1869 Wis. Laws 35; Act of Feb. 27, 1869, ch. 39, § 1, 1869 Minn. Laws 50-51; Act of Apr. 22, 1875, No. 97, § 1, 1875 Mich. Pub. Acts 136; Act of Nov. 25, 1884, No. 76, § 1, 1884 Vt. Acts. 74-75; Penal Code, § 7094, 1895 N.D. Rev. Codes 1259; Act of Mar. 8, 1909, ch. 240, § 22, 1909 S.D. Laws 450; Act of Mar. 22, 1909, ch. 249, § 266, 1909 Wash. Laws 973; Act of Feb. 14, 1913, No. 201, § 16, 1912 Vt. Acts 260-61; Act of Apr. 1, 1913, ch. 186, § 1, 1913 N.J. Laws 339; Act of Apr. 21, 1915, ch. 133, § 17, 1915 N.H. Laws 180-81; Act of July 7, 1921, ch. 530, § 1, 1921 Wis. Laws 870; Act of Feb. 11, 1925, ch. 31, § 1, 1925 Or. Laws 42; Act of Feb. 25, 1931, No. 58, § 1, 1931 S.C. Acts 78; Act of June 16, 1931, No. 327, § 236, 1931 Mich. Pub. Acts 671; *see* Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws 442.

In the mid-1920s, light, portable machineguns such as the Thompson submachine and the Browning Automatic Rifle became publicly available in the United States and began to be used by gangsters and criminals.  *See* Robert J. Spitzer, *Understanding Gun Law History After* Bruen*: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 60-63 (2023).  Between 1925 and 1934, at least half the states responded to this societal problem by enacting anti-machinegun laws, including comprehensive bans.[21]  Congress, too, responded to the "law violator" and "his most dangerous weapon," S. Rep. No. 73-1444, at 1-2 (1934), by enacting the National Firearms Act 1934, which imposed a $200 tax on machineguns and required that they be registered with the federal government, *see* 26 U.S.C. §§ 5801-5802, 5811-5812, 5821-5822, 5841-5842, 5845 (a)-(b). The $200 tax was prohibitively expensive to most Americans, as it was "equivalent to nearly $4,500 today."  W. Kip Viscusi & Kyle J. Blasinsky, Leve*raging Public Support for Gun Laws to Reduce Mass Shootings, 20*24 U. Ill. L. Rev. 707, 755 (2024).  The taxing and registration system made it more difficult for "the criminal

---

[21] *See* Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24-32; Act of May 16, 1927, ch. 552, § 1, 1927 Cal. Stat. 938; Act of Mar. 19, 1927, ch. 95, § 2, 1927 N.J. Laws 181; Act of Mar. 9, 1927, ch. 156, § 1, 1927 Ind. Acts 469; Act of Apr. 19, 1927, ch. 234, § 1, 1927 Iowa Acts 201; Act of Apr. 22, 1927, ch. 1052, § 4, 1927 R.I. Pub. Laws 257; Act of Apr. 27, 1927, ch. 326, § 1, 1927 Mass. Acts 413-14; Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 888-89; Act of May 28, 1929, ch. 132, § 1, 1929 Wis. Laws 157; Act of Apr. 25, 1929, No. 329, § 2, 1929 Pa. Laws 777; Act of Apr. 29, 1929, ch. 190, § 1, 1929 Neb. Laws 674; Act of June 1, 1929, H.B. 498, § 1, 1929 Mo. Laws 170; Act of Feb. 25, 1931, ch. 249, § 1, 1931 Del. Laws 813; Act of Mar. 9, 1931, ch. 178, § 2, 1931 N.D. Laws 306; Act of Apr. 15, 1931, ch. 435, § 1, 1931 N.Y. Laws 1033; Act of July 2, 1931, § 2, 1931 Ill. Laws 452-53; Act of July 7, 1932, No. 80, § 2, 1932 La. Acts 337; Act of Feb. 28, 1933, ch. 206, §§ 1-5, 1933 S.D. Laws 245-46; Act of Mar. 6, 1933, ch. 64, § 1, 1933 Wash. Laws 335; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 489; Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189; Act of Apr. 10, 1933, ch. 190, § 3, 1933 Minn. Laws 233; Act of Oct. 25, 1933, ch. 82, §§ 2-3, 1933 Tex. Laws 219; Act of Nov. 28, 1933, ch. 62, § 1, 1933 Kan. Laws 76; Act of Mar. 2, 1934, No. 731, §§ 2-4, 1934 S.C. Acts 1288; Act of Mar. 7, 1934, ch. 96, §§ 2-5, 1934 Va. Acts 138.

class" to obtain the weapons and made it easier to "convict [criminals] when they have the weapons." *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. at 6, 12, 22 (statement of Attorney General Homer Cummings).

In 1986, Congress adopted § 922(o) as part of the Firearm Owners' Protection Act, Pub. L. No. 99-308, § 102, 100 Stat. 449, 453 (1986). That provision "effectively freezes the number of legal machine guns in private hands at its 1986 level," *United States v. Kenney*, 91 F.3d 884, 885 (7th Cir. 1996), by making it illegal for "any person to transfer or possess a machinegun" unless the transfer or possession is (a) under the authority of a government entity or (b) involves a "machinegun that was lawfully possessed" before 1986, 18 U.S.C. § 922 (o)(2)(A), (B). The transfer of a pre-1986 machinegun continues to be subject to a $200 tax. 26 U.S.C. § 5811 (a).

Section 922(o) is consistent with the principles underlying this longstanding tradition of firearm regulation. English and American jurisdictions restricted the carrying of dangerous and unusual weapons even before the founding era. *See Rahimi*, 602 U.S. at 691. States restricted a variety of such weapons throughout the 1800s, apparently without "disputes regarding the lawfulness of such prohibitions." *Bruen*, 597 U.S. at 30. And many states—followed quickly by the federal government—began regulating machineguns within a few years of their

entry into civilian use.  Section 922(o) is therefore part of a tradition of weapons regulation that goes back to the founding.  And this longstanding tradition shows that the government may ban firearms not typically possessed by law-abiding citizens for lawful purposes, such as dangerous and unusual weapons.  *See Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring) ("post-ratification interpretations and applications by government actors—at least when reasonably consistent and longstanding—can be probative of the meaning of vague constitutional text.").

Post-ratification history is particularly relevant given that machineguns are largely a 20th-century innovation.  As *Bruen* recognized, "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to the analogical inquiry.  *Bruen*, 597 U.S. at 27.  The invention of machineguns—particularly lightweight and publicly available machineguns— represented a dramatic technological advancement.  Guns in the 18th century generally fired only one shot, often misfired, and took a long time to load.  See Randolph Roth, *Why Guns Are and Are Not the Problem, in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019).

The 1920s, however, saw the introduction of firearms like the Browning Automatic Rifle and Thompson submachine gun, which were lightweight, maneuverable, and could fire automatically at rates exceeding 600 rounds per minute from magazines containing at least 20 (and up to 100) rounds. Spitzer, *supra*, 51 Fordham Urb. L.J. at 61-63. The availability of such machineguns in the civilian market brought with it new societal concerns, including the use of such weapons by gangsters and other criminals. *Id.* at 62-63. The fact that many states and the federal government quickly responded to these societal and technological developments with laws regulating machineguns—and the absence of "disputes regarding the lawfulness of such prohibitions," *Bruen*, 597 U.S. at 30—indicates that § 922(o) is consistent with the longstanding tradition of regulating dangerous and unusual weapons. As Justice Kavanaugh explained in *Rahimi*, state and federal laws and practices "over time" have "often reflected and reinforced common understandings of the Constitution's authorizations and limitations." *Rahimi*, 602 U.S. at 724 (Kavanaugh, J., concurring).

The Second Amendment does not prohibit restrictions on the possession of machineguns and, therefore, Title 18, U.S.C. § 922(o) is constitutional.

## IV.    <u>CONCLUSION</u>

The defendant's challenge to Section 922(o) should fail because the Supreme Court has made clear that regulations of machineguns fall outside the Second

Amendment; and even if this Court were to conclude that the Second Amendment's plain text protects the possession of machineguns, Section 922(o) still does not violate the Second Amendment because the statute "is consistent with this Nation's historical tradition of firearm regulation."    Thus, for the foregoing reasons the defendant's motion must be overruled.

Respectfully submitted,

Ryan A. Kriegshauser
United States Attorney
District of Kansas

By:    /s/ *Lanny D. Welch*
　　　　LANNY D. WELCH, KS Bar No. 13267
　　　　Assistant United States Attorney
　　　　District of Kansas
　　　　301 N. Main, Suite 1200
　　　　Wichita, KS 67202
　　　　Ph: 316.269.6481
　　　　Fax: 316.269.6484
　　　　Lanny.Welch@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of July 2025, I electronically filed the

foregoing Response with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to the following:

J. Matthew Leavitt
Counsel for Defendant Beier
jmleavitt@hulnicklaw.com

By:   /s/  *Lanny D. Welch*
LANNY D. WELCH, KS Bar No. 13267
Assistant United States Attorney